P

(REV)

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

SEP 1 2 2007

CLERK, U.S. DISTRICT COURT
By _____
　　　　Deputy

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| IP FUND 1, INC. <br> THOMAS B. RAMEY, JR. <br><br>     Plaintiffs, <br><br> V. <br><br> MICHAEL E. KELLY, LORI LEUTH KELLY, LORI KELLY LEVY, MICHAEL P. KELLY JR., DONALD KELLY, GWEN BEEM, LEONARD KELLY, MARK G. MEYER, RICK GREENE, BRANTLEY H. WRIGHT, JOHN CORWIN, ANTHONY J. CAMPANALE, GABRIEL ESCALANTE TORRES, ERIC MEYER, RESORT HOLDINGS INTERNATIONAL, INC., RESORT HOLDINGS INTERNATIONAL, S.A., YUCATAN RESORTS, INC., d/b/a YUCATAN RESORTS INTERNATIONAL, S.A., YUCATAN RESORTS, S.A. DE C.V., YUCATAN INVESTMENT CORP., AVALON RESORTS, S.A., WORLD PHANTASY TOURS, INC., d/b/a MAJESTY TRAVEL d/b/a VIAJES MAJESTY, GALAXY PROPERTIES MANAGEMENT, S.A., THE CAMELOT GROUP, INC., COMERCIALIZADORA VACACIONAL PANANMA, S.A., PUERTO CANCUN S.A, PANORAMA COMMUNITIES, S.A, TRUST COMPANY OF AMERICA, TRUST COMPANY OF THE PACIFIC, <br><br>     Defendants | §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§ <br><br> CIVIL CASE NO. _____ <br><br> 307 CV 1556 - P <br><br> iVB 45 |

## COMPLAINT

Plaintiffs, I P FUND 1, INC. and its MEMBERS, and THOMAS B. RAMEY, JR., for their Complaint against MICHAEL E. KELLY, LORI LEUTH KELLY, LORI KELLY LEVY, MICHAEL P. KELLY JR., DONALD KELLY, GWEN BEEM, LEONARD KELLY, MARK G. MEYER, BRANTLEY H. WRIGHT, JOHN CORWIN, RICK GREENE, ANTHONY J. CAMPANALE, GABRIEL ESCALANTE TORRES, ERIC MEYER, RESORT HOLDINGS INTERNATIONAL, INC., RESORT HOLDINGS INTERNATIONAL, S.A., YUCATAN RESORTS, INC., d/b/a YUCATAN RESORTS, S.A., YUCATAN RESORTS INTERNATIONAL, S.A. DE C.V., YUCATAN INVESTMENT CORP., AVALON RESORTS, S.A., WORLD PHANTASY TOURS, INC., d/b/a MAJESTY TRAVEL d/b/a VIAJES MAJESTY, GALAXY PROPERTIES MANAGEMENT, S.A., THE CAMELOT GROUP, INC., COMERCIALIZADORA VACACIONAL PANANMA, S.A., PUERTO CANCUN S.A., PANORAMA COMMUNITIES, S.A., TRUST COMPANY OF AMERICA, and TRUST COMPANY OF THE PACIFIC allege and state:

## <u>PARTIES</u>

1.   Plaintiff, IP Fund 1, Inc. ("IPF") is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in San Antonio, Texas.  Members of the IP Fund 1, Inc. are leaseholders who purchased Universal Leases from Defendant, Resort Holdings Inc. through Defendants, Mark G. Meyer and others.

2.   Plaintiff, Thomas B. Ramey, Jr. ("Ramey") is an individual residing in the State of Texas. Ramey, individually and, as trustee of The Ramey Family Charitable Trust, purchased Universal Leases offered for sale by Defendant, Resort Holdings International ("RHI") through Defendants, Mark Meyer ("M. Meyer") and others.

3.   Defendant, Michael E. Kelly ("M. Kelly") is an individual who is a United States Citizen and former resident of the South Bend, Indiana area.  M. Kelly now is a Mexican citizen and a Belize citizen, and has resided in Cancun Mexico.  M. Kelly currently is in the custody of the United States in Chicago, Illinois.

4. Defendant, Lori Lueth Kelly ("L. Lueth") is an individual who resides at is a United States Citizen and former resident of the South Bend, Indiana area. Until recently, L. Leuth was a resident of Cancun, Mexico. L. Lueth was, and is, the wife of M. Kelly. She is believed to be residing currently in the Chicago, Illinois area.

5. Defendant, Lori Levy Kelly ("L. Kelly") is an individual who resides at Pez Valador #11, Zona Hotelera, Cancun, Quintana Roo, Mexico 77500, and is a citizen of the State of Indiana. L. Kelly is the daughter of M. Kelly and she served in the capacity of promoter and agent of RHI and other M. Kelly enterprises.

6. Defendant, Michael P. Kelly, Jr. ("Mike Jr.") is an individual who resides at Boulevard Pok Ta Pok #17 A-2, Club de Golf Pok Ta Pok, Zona Hotelera, Cancun, Quintana Roo, Mexico 77500, and is a citizen of the State of Indiana. Mike Jr. is the son of M. Kelly and he served  as a principle of RHI and was a direct beneficiary of all business endeavors of M. Kelly.

7. Defendant, Donald Kelly ("D. Kelly") is an individual who resides at Boulevard Pok Ta Pok #17 A-1, Club de Golf Pok Ta Pok, Zona Hotelera, Cancun, Quintana Roo, Mexico 77500, and is a citizen of the State of Indiana. D. Kelly is the son of M. Kelly and he was a principle of multiple M. Kelly corporations and served in the capacity of promoter for RHI.

8. Defendant, Gwen Beem ("Beem") is an individual who resides at 4072 Laurel Grove Road, Douglasville, Georgia 30135, and is a citizen of the State of Georgia. Beem is the adopted daughter of M. Kelly and she served as a principle of RHI and was a direct beneficiary of all business endeavors of M. Kelly.

9.      Defendant, Leonard Kelly ("L. Kelly") is an individual who resides at 23105 Pierce Road, Lakeville, Indiana 46536, and is a citizen of the State of Indiana. L. Kelly is the father of M. Kelly and he served as a principle of RHI and was a direct beneficiary of all business endeavors of M. Kelly.

10.     Defendant, Mark G. Meyer ("M. Meyer") is an individual who resides at 895 Mariners Court, Coppell, Texas  75019 and is a citizen of the State of Texas. M. Meyer was a principle of RHI and multiple M. Kelly corporations.

11.     Defendant, Rick H. Greene ("Greene") is an individual who resides at 3206 Viney Lane, Bloomington, Illinois, and is a citizen of the State of Illinois. Greene was, and is, a director and officer of Defendant, The Camelot Group, Inc.

12.     Defendant, Brantley H. Wright ("Wright") is an individual whose primary place of employment is 135 North Pennsylvania Street, Indianapolis, Indiana 46204 and is a citizen of the State of Indiana.  Wright served as general counsel for RHI and M. Kelly and served as a Chief Financial Officer for multiple M. Kelly corporations.

13.     Defendant, John Corwin ("Corwin") is an individual who resides at Blue Bay Hotel, Km 1.5 Carretera Puerto Juarez Apartment 309, Cancun, Quintana Roo, Mexico 77500, and is a citizen of the State of Indiana.  Corwin was the principle in charge of the development and marketing of the Universal Lease Program.

14.     Defendant, Anthony J. Campanale ("Campanale") is an individual who resides at 539 N.E. 10th Street, Fort Lauderdale, Florida 33301 and is a citizen of the State of Florida. Capanale served in the capacity of Senior Vice President of RHI and served as a principle for multiple M. Kelly corporations.

15.   Defendant, Gabriel Escalante Torres ("Escalante") is an individual who resides at Paseo del Sol lote # 15-3, Manaza # 7, Cancun, Quintana Roo, Mexico and is a citizen of the United States of Mexico.  Escalante was the director, officer and agent of Galaxy/Majesty and served as a liaison between M. Kelly and Mexican officials.

16.   Defendant, Eric Meyer ("E. Meyer") is an individual who resides at Calle Eusebio A. Morales, Edeficio Atlanyida P. Baja APDO 8301, Zona Panama, Panama City, Republic of Panama, and is a citizen of Texas.      E. Meyer was the principle in charge of the Universal Lease Buy-Back Program.

17.   Defendant, Resort Holdings International, Inc. ("RHI") is a Nevada corporation with its principal place of business at Avenida Coba #44, Lote 10, Cancun, Quintana Roo, Mexico, and is a citizen of the United States. [1]

18.   Defendant, Resort Holdings International, S.A. ("RHI-SA") is a Panamanian corporation with its principal place of business at Avenida Coba #44, Lote 10, Cancun, Quintana Roo, Mexico, and with a place of business at Calle Manuel Maria Icaza, P.H. Cort Building, Panama City, Republic of Panama, and is a citizen of the Republic of Panama.

19.   Defendant, Yucatan Resorts, Inc. ("YRI") is a corporation with its principal place of business at Avenida Coba #44, Lote 10, Cancun, Quintana Roo, Mexico, 77500 and is a citizen of the United States of Mexico.

20.   Defendant, Yucatan Resorts International, S.A., de C.V. ("YR-SA") is a Panamanian corporation with its principal place of business at Avenida Coba #44, Lote 10, Cancun, Quintana Roo, Mexico, 77500, and a place of business at Calle Manuel Maria Icaza,

---

[1] Defendants M. Kelly et al. have multiple corporations by which he has conducted or diverted funds from the Universal Lease Scheme. One such corporation was Comercializadora Hodgson S.A. de C.V. and it is the intent of this Complaint to prohibit the Defendants from profiting from this scheme; therefore, Plaintiffs request the leniency of the court in its ability to ascertain where the assets from this scheme were/are held.

P.H. Cort Building, Panama City, Republic of Panama, and is a citizen of the Republic of Panama.

21.    Defendant, Avalon Resorts, S.A. ("Avalon") is a Mexican corporation with its principal place of business at Avenida Coba #82, Lote 10, 3er Piso Cancun, Quintana Roo, Mexico, and is a citizen of the United States of Mexico.

22.    Defendant, Yucatan Investment Corp. ("YIC") was an Indiana corporation with its principal place of business at Avenida Coba #82, Lote 10, 3er Piso Cancun, Quintana Roo, Mexico, and was a citizen of the state of Indiana.

23.    Defendant, World Phantasy Tour, Inc. ("WPT") Inc., and World Phantasy Resorts, Inc., are Panamanian corporations with their principal place of business at Calle Eusebio A. Morales, Edificio Atlantida, Planta Baja, Panama City, Republic of Panama. WPT does business as Majesty Travel and as Viajes Majesty. WPT is a citizen of the Republic of Panama.

24. Defendant, Galaxy Properties Management, S.A. ("Galaxy") is a Panamanian corporation with its principal places of business at Calle Eusebio A. Morales, Edificio Atlantida, Planta Baja, Panama City, Republic of Panama. Galaxy is a successor to WPT. Galaxy is a citizen of the Republic of Panama.

25. Defendant, The Camelot Group, Inc. ("Camelot") is an Illinois corporation with its principal place of business at 3106 GE Road, Suite 4, Bloomington, Illinois. Camelot is a citizen of the state of Illinois.

26. Defendant, Comercializadora Vacacional Panama, S. A. ("CVP") is a Panamanian Corporation with its principal place of business and legal representative located at Janio Lescure, Calle 69 San Francisco, P.H. Alpha Real, Planta Baja, Local #2, Panama, Republic of Panama. CVP is a citizen of the Republic of Panama.

27.   Defendant, Puerto Cancun ("PC") is a Mexican Corporation with its principal place of business and legal representative located at Av. Coba #43, Lote 16, S.M. 4 Cancun, Quintana Roo, Mexico, and is a citizen of the United States of Mexico.

28.   Defendant, Panorama Communities, S.A. ("Panorama") is a Mexican Corporation with its principal place of business and legal representative located at Av. Coba #43, Lote 16, S.M. 4 Cancun, Quintana Roo, Mexico, and is a citizen of the United States of Mexico.

29.   Defendant, Trust Company of America is a Corporation with its principal place of business and registered agent Gregory S. Jones, located at 7103 S. Revere Parkway, Centennial, Colorado, 80112 and is a citizen of the State of Colorado.

30.   Defendant, Trust Company of the Pacific, L.L.C. is a Corporation with its principal place of business and registered agent P. Sterling Kerr, located at 3525 East Harmon Avenue, Las Vegas, Nevada 89121 and is a citizen of the State of Nevada.

## JURISDICTION AND VENUE

31.   This Court has jurisdiction over this action pursuant to the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §1964, pursuant to 28 U.S.C, §1331, 1337(a), and 1367(a) and pursuant to the pendent jurisdiction of this Court.   Transactions, acts, practices and courses of business constituting the violations herein occurred within the jurisdiction of the United States District Court for the Northern District of Texas and elsewhere.

32.   Venue is proper pursuant to RICO. 18 U.S.C. §1965, and 28 U.S.C. §1391(b).

## THE STRUCTURE OF THE SCHEME

33.   Beginning in or about 1998, M. Kelly began incorporating or otherwise organizing or establishing various entities, including, but not limited to, RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, CVP, PC, and Panorama.

34. YIC offered and sold nine-month promissory notes for a period of time up to, and including, 1999.

35. YRI and YR-SA orchestrated a Universal Lease Program involving Universal Leases in properties located in Cancun, Mexico, and other Central American locales.

36. The Defendants started marketing Universal Leases on, or about, July 1999 after YIC and M. Kelly were accused of promotion of an illegal timeshare scheme associated with the promissory note sales. M. Kelly and YIC were the subject of enforcement actions related to the promissory notes. The New Mexico and South Carolina State Security Boards held administrative hearings and demanded that the Defendants stop selling nine-month promissory notes and refund the monies to purchasers.

37. The Universal Lease program was initiated as a continuation of the fraudulent enterprise started by M. Kelly, his family (Collectively "Kellys") and others under the names of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, CVP, and PC. The Kellys and others conspired to sell Universal Leases to conceal the fraud begun with the nine-month notes. M. Kelly reimbursed nine-month note holders by substituting the nine-month notes with Universal Leases. This satisfied various state regulatory proceedings. The Kellys and others were no longer selling the nine-month notes and the holders were being given an interest in the properties. The holders were unaware that the interest received was a nullity and they had once again been taken by a M. Kelly scam.

38. M. Kelly, directly and indirectly, at all times material hereto, oversaw and controlled the enterprise from the operation of the nine month note scheme and continuing into the sales, operations and the expenditure of funds in connection with the Universal Lease scheme.

39. L. Lueth acted together with M. Kelly, her husband, for the financial benefit of the marital community. L. Lueth enjoyed a position of prestige and status in the community which conferred a benefit upon the marital community. L. Lueth's presence with M. Kelly and her involvement with spouses/families of agents, purchasers, and prospective buyers, resulted in a form of advertising and promotional activities. L. Lueth engaged in activities designed to increase sales, she established herself within various community activities and local churches to further Kelly's credibility in the Mexican community and with prospective buyers. M. Kelly's sale of Universal Leases was acquiesced to and ratified by L. Lueth, as she attended her husband's promotional events. RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, CVP, and PC were started with marital community funds and all income derived from these businesses inured to the benefit of the marital community.

40. The fraudulent enterprise developed by the Kellys was implemented by various defendants, including M. Meyer and Greene. These defendants developed the marketing program for the Universal Leases and recruited and coordinated sales agents to market and sell the Universal Leases.

41. M. Meyer, Greene and others through YRI, YR-SA, and eventually RHI and RHI-SA, distributed sales literature and marketed the Universal Lease Program throughout North America.

42. M. Meyer's involvement with Kelly began with the operation of the nine-month note scheme. M. Meyer continued to be involved in the operation and management of the timeshare program and currently is Vice President of PC.

43. M. Meyer worked in unison with Camelot and Greene to assist in reselling interests in the Universal Lease Program, thus furthering the enterprise.

44.   Greene was an executive for Ruttenberg and Associates Insurance Marketing in charge of marketing the Universal Lease Program. After discontinuing his association with Ruttenberg, Greene was made a master broker with RHI and continued to recruit new brokers. Later, Greene headed the operations and management of the resale of the Universal Leases and the marketing of the Port Of Cancun.

45.   Wright, as a shareholder of Leagre Chandler & Millard LLP, participated in the promotion of the Universal Lease Program and in the structure and implementation of the resort management and servicing of the Universal Lease Program by WPT and Galaxy, PC.

46. Campanale was RHI's Chief Executive Officer and was involved in the management of RHI's operations since 2004 and concealed M. Kelly's and other defendants' wrongdoings.

47.   Corwin, a longtime associate of M. Kelly, acted as head of marketing for the Universal Lease Program, as an Executive of RHI, RHI-SA, YRI, YRI-SA, and YIC and worked as a liaison between M. Kelly and sales agents.  Corwin was active in masking the problems M. Kelly's organizations incurred.  Agents were directed to Corwin when they inquired as to why their clients' contracts were not honored.  Corwin, with full knowledge of the inability to complete the purchasers' contract(s), offered multiple reasons for the breach (es) and assured the agents the contracts would be honored.

48.   In distributing interests in the Universal Lease Program, RHI provided promotional services and was responsible for the recruitment of sales agents.

49.   In distributing interests in the Universal Lease Program, RHI-SA coordinated with RHI to provide promotional assistance and to perform various administrative functions.

50.   WPT purported to act as a resort manager, travel agency, and as a servicing agent for the Universal Lease Program.

51.  Galaxy did, and does, purport to act as a resort manager and travel agency and as a servicing agent for the Universal Lease Program.

52   Avalon has the same business address as RHI, RHI-SA, YRI, YR-SA, and YIC in Cancun, Mexico, and develops resorts in Mexico in which RHI, RHI-SA, YRI, YR-SA, and YIC offer and sell interests.

53.  In offering and selling interests in the Universal Lease Program to retired persons, including Plaintiffs IPF Members and Ramey, M. Kelly and others involved in the management and marketing of the Universal Lease Program through RHI, RHI-SA, YRI, YR-SA, and YIC required a "custodian" to hold the assets of self-directed "rollover" IRA accounts used to purchase Universal Leases.

54.  M. Kelly and others involved in the management and marketing of the Universal Lease Program through RHI, RHI-SA, YRI, YR-SA, and YIC, promoted and made use of the services of Trust Company of America as a "custodian," until Trust Company of America resigned as custodian of Universal Leases owned by IRA accounts on January 1, 2005.

55.  Greene then formed and used RHI money to fund a new IRA custodian, Trust Company of the Pacific, to replace Trust Company of America.

56.  Greene's Trust Company of the Pacific allowed Kelly to further his fraudulent enterprise by creating Trust Company of the Pacific to facilitate the transfer of IRA accounts, avoid deregistration, and account holder penalties. Greene knew that Trust Company of America had placed Kelly on notice that it would no longer administer the IRA accounts for RHI Leaseholders.  Once Trust Company of America withdrew as the custodian and Kelly did not have a new IRA custodian for the leaseholders it would have exposed the fraudulent enterprise when the leaseholders received notices from the IRS demanding tax payment for distributions of

their IRA accounts that they used to purchase Universal Leases.

57.   Escalante, as former President of the Association of Hotels of Cancun, was employed by M. Kelly to use his influence and, through his capacity as an agent of Galaxy and Majesty, to further M. Kelly's fraudulent enterprises by directing monies to be paid to government officials in order to ease government regulations.

## OPERATION OF THE UNIVERSAL LEASE PROGRAM

58.   The program promoted by RHI, RHI-SA, YRI, YR-SA, and YIC offered the "Universal Lease Program" for the sale of timeshare units in various properties developed by Avalon, in Cancun Mexico, and elsewhere.

59.   Universal Leases were priced at a minimum of $5,000 per unit.

60.   Purchasers' funds were deposited in YRI, RHI, and/or Avalon bank accounts located in Indiana, Florida, and Ohio from which the funds were wired to various offshore accounts for undisclosed purposes.

61.   Although M. Kelly and others involved in the management and marketing of the Universal Lease Program through RHI, RHI-SA, YRI, YR-SA, and YIC, distributed a variety of brochures and promotional materials to potential and actual purchasers, purchasers of Universal Leases were never informed as to the uses of the purchase payments, including repayment of the nine-month notes, and were never provided with a financial statement that reflected the solvency of the sellers and operators of the Universal Lease Program.

62.   Prospective purchasers that visited the property and attended seminars given by M. Kelly, Corwin, Greene, and M. Meyer were allowed to preview of YRI/RHI's plans to acquire more resort properties.

63. As part of the Universal Lease Program's sales strategy, prospective purchasers were given the option to roll part or all of their IRA into the Universal Lease Program.

## SPECIFICS OF THE UNIVERSAL LEASE PROGRAM

64. RHI's promotional materials informed potential purchasers that they were being afforded an opportunity to select one of three separate Universal Lease Program "management options."

65. In fact, options 1 and 2 required the most outlay by purchasers while yielding the least return, making option 3 the most attractive alternative.

66. M. Kelly and other Defendants heavily promoted Universal Lease Program's "third option" as the best selection for purchasers.

67. Under Universal Lease Program "Option 1," a purchaser would forego any rental income on his or her purchase and instead personally use the vacation unit. RHI assigned to the purchaser, a specific unit for a designated week (annually/biannually) at a specific location - with the purchaser having no input as to the date, quality or location of the timeshare assignment. Option 1 would require the purchaser to pay annual maintenance fees, (ranging from $380 to $645 per year adjusted based on the Consumer Price Index). Option One did not provide the purchaser the ability to select a specific unit and no means to generate rental income, this option was most unappealing.

68. Under Universal Lease Program "Option 2," a purchaser would personally procure a tenant to rent out the vacation unit. Option 2 would require the purchaser to forego any guaranteed rental of the vacation unit and imposed substantial annual maintenance fees upon the owner, thus there was no incentive to elect option 2.

69. YR-SA's and RHI's sales literature and promotional brochures touted Universal Lease Program's "Option 3" and informed prospective purchasers that those who "selected' "Option 3" would be eligible to receive, as rental income, an eleven (11%) or nine (9%) percent per annum[2] on their vacation unit every year for a period of 25 years, after which time the lease would be renewable for another 20 years.   M. Kelly represented that if the leaseholder allowed the rental income to accumulate in an account held by a M. Kelly entity, the account would incur no taxable earnings.

70. If a purchaser chose "Option 3," the purchaser was required to employ an "independent third-party" management company to lease the vacation unit.   The "independent third-party" management company represented the rental income would equal eleven (11%) or nine (9%) percent on his or her initial purchase price of the Universal Lease(s) per annum.

71. The Universal Lease Program identified WPT as the "independent third-party" designated management company to perform the servicing of the Universal Leases.

72. Although the Universal Lease Program application did not mandate selection of WPT as the servicing agent, the selection of WPT was the only listed means to earn the represented eleven (11%) or nine (9%) percent per annum rate as rental income on a Universal Lease and Leaseholder would not incur any management fees.

73. To "select" WPT as a servicing agent, purchasers were instructed to complete a formal "Management Agreement" with WPT.

74. The WPT "Management Agreement" was bundled with the Universal Lease Program's promotional and application materials.

---

[2] YR-SA's and RHI's original contracts offered purchasers rental income equal to 11% of their original purchase price, later contracts reflected rental income equal to 9% of their original purchase price.

75.    Neither RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, M. Kelly, M. & E. Meyer, Escalante, nor Greene disclosed any financial or other relationship between RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, M. Kelly and WPT.

76.    Purchasers were assured that, once they had purchased a Universal Lease and executed the WPT "Management Agreement," WPT would pay the equivalent of eleven (11%) or a nine (9%) percent per annum as rental income for the twenty-five (25) year life of the Universal Lease.    WPT pledged that, if after thirty-six (36) months, the purchaser was dissatisfied WPT would purchase the Universal Lease "for the original purchase price."    M. Kelly also represented to Leaseholders that if WPT did not honor this agreement, M. Kelly would buy back the lease through RHI.

77.    Marketing materials for the Universal Lease stated "The Yucatan properties are fully insured against loss. All properties are in compliance [with] the governing laws. Being in compliance with the regulations to sell timeshares, all properties are 100% free of debt. As a result, the Leaseholders have a first lien on the Yucatan Resort/ RHI properties."

78.    In 2004, M. Kelly caused WPT's servicing responsibilities under the "Management Agreement" to be transferred to Galaxy. WPT sold the rental assets and liabilities of WPT's business to Galaxy, without notification to sales agents or Leaseholders.

79.    By letter dated June 8, 2004, Galaxy announced the transfer and informed the Universal Leaseholders they would be receiving a new Rental Management Agreement, the "Galaxy Residence Club Membership Rental Management Agreement." This new agreement deleted any reference to any guaranteed payment of the equivalent of the eleven (11%) or nine (9%) percent per annum as rental income and of any assurance that the servicer, i.e. Galaxy, would purchase the Universal Lease "for the original purchase price" at any time after thirty-six

(36) months. The new agreement was, in essence, an adhesion contract essentially offered on a "take it or leave it" basis, without affording the Leaseholders a realistic opportunity to bargain, and under such conditions that the Leaseholder could not obtain any rental income without acquiescing to the agreement, Leaseholders had no choice as to the terms of the agreement. Leaseholders were also pressured by the threat of incurring management fees if they selected another management option.

80. By late 2004, multiple leaseholders and agents were dissatisfied with the new management and demanded the leases be honored. M. Meyer, Camelot and Greene presented proposals to Universal Leaseholders by which they would arrange the sale of Universal Leases for ninety (90%) percent of the original purchase price plus and the rental income accumulated. The buyer would pay the total price, purchase price plus rental income, and the funds from the sale would be held for Leaseholder in accounts managed by M. Kelly entities.    Additionally, to complete the transaction, Leaseholders would be required to pay a ten (10%) percent commission to Pac West Realty or other M. Kelly entities, for handling the transaction, while M. Kelly and others had misrepresented that these were "unrelated" companies.    M. Kelly and others established a gross inadequacy in bargaining power.    The terms of the agreement were unreasonably favorable to M. Kelly and others while unconscionable and unfair towards the Leaseholders.

81.    In January 2005, Galaxy issued a letter explaining the company had reduced the rental income payments to five (5%) percent. The reduction was attributed to hurricane damage, negative publicity, a saturated market in Cancun causing large discounts and a renovation of the properties. These representations were designed to conceal the diversion of leaseholders' funds and the fraudulent enterprise. M. Meyer is known to have written this letter and directed it to be

sent. Corwin and E. Meyer sent similar letters and told IPF members they were working on the problem, assuring them everything was under control, blaming past management and the hurricanes for the shortfall.

82.    Thereafter, M. Meyer began contacting leaseholders and represented that the leases would have to be redone due to hurricane storm damage.  This representation was designed to conceal the diversion of funds and the fraudulent enterprise.

83.    Upon information and belief, Green, M. Meyer, Wright, Campanale, and Corwin participated with the Kellys in the operation and management of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, and CVP, including the development of WPT as a purported independent third party management company, the represented transfer from WPT to Galaxy, the distribution of payments, the representations about the operation of the timeshares, and the possible sales of Universal Leases to unrelated parties through a related entity in furtherance of the fraudulent enterprise.

## REGULATORY PROCEEDINGS

84.    On or about May 18, 1999, the New Mexico Securities Division issued orders against YIC and M. Kelly in connection with the offer and sale of nine-month promissory note investments through unlicensed sales agents in violation of New Mexico securities law.

85.    On or about July 26, 1999, the South Carolina Securities Division issued an administrative order against YIC in connection with the unregistered and fraudulent sale of YIC nine-month promissory notes through unlicensed sales agents in violation of South Carolina securities laws.

86.    On or about October 4, 1999, the Minnesota Department of Commerce issued a Cease and Desist Order directed to YIC and M. Kelly, as YIC's president, in connection with the

sale of unregistered, non-exempt securities in violation of Minnesota securities laws.

87.   On or about November 7, 1999, the Connecticut Banking Commissioner issued a Cease and Desist order directed to YIC in connection with the sale of unregistered securities, i.e., nonexempt promissory note investments, through unlicensed sales agents in violation of Connecticut securities laws.

## DEALINGS WITH IPF MEMBERS

88.   On, or about, February 10, 2006, a group of individuals who were victimized by the Defendants' Universal Lease Program united to seek legal redress for infringement of their rights by asserting its rights and the corresponding rights of its members in defraying the expense of and assisting in the process of litigation.

89.   There are over 600 IPF members, representing over 50 million dollars in purchased leases.   Each Leaseholder received the promotional literature developed and disseminated by RHI, RHI-SA, YRI, YR-SA, Avalon, M. Kelly, M. Meyer, E. Meyer, Greene, Wright, Campanale and Corwin, executed Management Agreements and received either payments from WPT, and later Galaxy, or statements of account showing the accrual of the guaranteed rental income.   Leaseholders received the Galaxy letter dated June 8, 2004, representing WPT was in the process of transferring the management of the Universal Leases to Galaxy and requesting each leaseholder execute a new Rental Management Agreement. None of the agreements addressed the accumulated rental income.

90.   In late 2004, IPF Members sought to enact the buy-back provisions of their leases and were told by RHI those provisions were no longer being honored.   RHI stated that an "unrelated third party," later known to have been organized by RHI, M. Kelly and others, would arrange a buyer for their leases for a reduced price and the Leaseholder would receive 90% of the

value of the Universal Lease, the remaining ten (10%) percent was to be paid as commission to Pac West Realty, Greene, and/or E. Meyer.

91.   IPF Members also received the February 2005 letter from Galaxy explaining the reduced payments were attributable to hurricane damage, negative publicity, a saturated market in Cancun causing large discounts and renovation of the properties.

92.   Thereafter, M. Meyer and E. Meyer began contacting leaseholders, including IPF members, by telephone and represented that the leases would have to be modified due to hurricane storm damage.  This representation also was designed to conceal the diversion of funds and the fraudulent enterprise.

93.   In or around August 2006, RHI formed a corporation, Comercilizadora Vacacional Panama, S.A. ("CVP") and, with the assistance of E. Meyer and Escalante, sought out dissatisfied IPF members.  CVP representatives offered to purchase individual Universal Leases owned by IPF members at 30% of the value of the leaseholder's lease.  CVP was, in actuality, a shell corporation begun by M. Kelly, Escalante, and E. Meyer to reacquire leases for RHI's inventory and to conceal the fraudulent scheme to resell the previously sold timeshares.

## DEALINGS WITH PLAINTIFF RAMEY

94.   In 2002, Plaintiff Ramey received RHI's, RHI-SA's, YRI's, YR-SA's, Avalon's and YIC's Universal Lease promotional literature directly and/or indirectly distributed by M. Kelly, M. Meyer, Greene, and others.

95.   Thereafter, Plaintiff Ramey was contacted by John Saucier ("Saucier"), a local RHI sales representative.  Saucier contacted Ramey who was disappointed with the returns of the traditional market and was looking for a business opportunity which offered higher earnings. Plaintiff Ramey was influenced by Saucier's years of experience as a financial adviser, and

inquired as to the diligence Saucier had conducted with regards to RHI. Saucier explained he had toured the resort properties, met with M. Kelly, investigated M. Kelly's background, and that Saucier's clients who had purchased a Universal Lease were very pleased with the passive income stream RHI offered. On that basis, Plaintiff Ramey purchased leases with his personal savings funds and funds from the Ramey Family Charitable Trust. Following the initial purchase, Plaintiff Ramey and his spouse along with Saucier were invited to Cancun to view the properties. While in Cancun, Plaintiff Ramey discovered a flourishing tourist economy, quality resorts, and numerous guests which led Plaintiff Ramey to believe the revenues represented in the Universal Lease program would be delivered. Plaintiff Ramey was personally hosted by Saucier, and assured by Corwin, M. Kelly, and L. Lueth that the Universal Leases would be rented providing the purchaser the represented income stream. Plaintiff Ramey was personally guided by M. Kelly on a tour of the Universal Lease Program's business operations, and spoke with several of the named defendants. Plaintiff Ramey, a first time visitor to Cancun, observed the business offices managed by Corwin and M. Kelly, their organization substantially supported the Defendants' original representations and raised no suspicions as to the success of the program.

96. Through the above direct and indirect solicitation by RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, M. Kelly, WPT, M. Meyer, Corwin and Greene on or about August 21, 2002, Ramey and RHI-SA entered into a contract to purchase Universal Leases L5754 and L5755 and WPT entered into a "Management Agreement" with Ramey with respect to Universal Leases L5754 and L5755.

97. Plaintiff Ramey chose to receive monthly payments of the rental income of nine (9%) percent rental compensation from WPT. Thereafter, Plaintiff Ramey began to receive

monthly rental income.

98. On or about June 21, 2004, RHI informed Plaintiff Ramey that it was in the process of transferring the management of his Universal Leases from WPT to Galaxy. The notice did not indicate that the new management company would honor Leaseholders' represented rental income equivalent of nine (9%) percent per annum for the twenty-five (25) year life of the Universal Lease nor the assurance that the servicer, i.e., Galaxy, would purchase the Universal Lease "for the original purchase price" at any time after thirty-six (36) months.

99. Thereafter, Plaintiff Ramey began to receive reduced rental income payments. In February 2005, Galaxy, in an attempt to further the fraudulent scheme, sent Plaintiff Ramey a letter explaining the reduced payments were attributable to hurricane damage, negative publicity, a saturated market in Cancun, and renovations of the properties. The new arrangement was, in essence, a unilateral action offered on a "take it or leave it" basis, without affording the Leaseholders a realistic opportunity to obtain the benefits they originally contracted for with WPT. Plaintiff Ramey did not recognize these actions as binding on the parties; here Leaseholders had no choice as to the terms of the agreement and were at the mercy of Galaxy's actions

100. Then, in March 2005, the rental payments ceased. Without further explanation, Galaxy became confiscatory and exhibited no actual intention to honor the parties' original agreement.

101. By letter dated September 9, 2005, Plaintiff Ramey informed M. Kelly, RHI, RHI-SA, and Avalon that he wished to withdraw all funds he had placed in the Universal Lease Program in Universal Leases L5754 and L5755, including delinquent rental payments. M. Kelly, M. Meyer, Corwin, and others failed to honor their original agreement with Plaintiff Ramey.

These Defendants failed to respond to Plaintiff Ramey's correspondence.

## MISREPRESENTATIONS AND OMISSIONS

102.   In connection with the scheme to defraud IPF members, Ramey and others, the following material were written and/or oral representations were made to IPF members and Ramey or their representatives:

a.     Leaseholders were to be guaranteed an eleven (11%) or nine (9%) percent per annum rental income on a Universal Lease purchase.

b.     The percentage per annum rental income was guaranteed for twenty-five (25) years and could be extended for an additional twenty (20) years.

c.     Within thirty-six (36) months after purchasing a Universal Lease, Plaintiffs could cancel their Universal Leases, receive an immediate return of the original purchase price, less a ten percent (10%) redemption charge, and any annual income accrued.

d.     Thirty-six (36) months after purchasing a Universal Lease, IPF Members, Ramey, and others could redeem their Universal Leases, receive an immediate return of the original purchase price, incur no redemption charge, and any annual income accrued.

e.     The Universal Leases were supported by "debt-free" resort properties.

f.     The Universal Leases were represented as safe and secure purchases.

g.     The properties were insured by internationally known, including an entity touted to be an affiliate of Lloyds of London, highly rated insurance companies against property, casualty loss, and damages, including hurricanes. Defendants represented the Universal Leases were insured to cover rental income loss in the event of a hurricane.

h.     The Universal Leases were suitable purchases for retirement savings.

i.     WPT would, upon Leaseholder's request, repurchase Universal Leases thirty-six (36) months after the date of purchase.

j.     Monthly payments and/or statements of leaseholders' accounts constituted the payment or the accrual of annual income generated by the rental of the Leaseholders' units.

k.     The reduction of payments or accrued income from Galaxy was attributable to hurricane damage, negative publicity, a saturated market in Cancun causing large discounts and a renovation of the properties.

l.     In 2005, the leases were modified due to hurricane damage.

103.    In connection with the scheme to defraud Plaintiffs, the following material information was not disclosed to IPF Members, Ramey and the others, either in writing or orally:

a.     Proceeds from the sales and rentals of Universal Leases were being diverted to repay the purchasers of nine-month promissory notes as ordered by the State Securities Regulators.

b.     Neither RHI, RHI-SA, YRI, YR-SA, Avalon, RMI, WPT nor Galaxy had the ability or intention of repurchasing Universal Leases, whether within thirty-six (36) months of the date of the original purchase or otherwise.

c.     The Universal Lease Program was not liquid.

d.     There was a network of deception created by Defendants to conceal the variety of financial and other relationships between RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, PC,, CVP, Trust Company of the Pacific, M. Kelly, M. Meyer, Greene and others. For example, Defendants did not disclose that RHI and RHI-SA and M. Kelly handled all the backroom operations for WPT including rental checks which were sent by Kelly from YRI or RHI.

e.     The finances of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, PC, CVP, and M. Kelly were diverted from their represented financial endeavors.

f.     When M. Kelly owned and operated Lorwen Industries, the New Avanti Motor Corporation and Avanti Motor Corporation, shareholders, lenders and loan guarantors suffered losses.

g.     Amounts shown, and to be shown, on Rental Income Statements were not held, and would not be held, in any segregated accounts for the benefit of the leaseholders.

h.     Any rental compensation received for use of a vacation unit assigned to a Universal Lease would be commingled with funds of other Universal Leases and would be used for the business purposes of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, CVP, PC, and/or the Kellys' lavish lifestyle which included a private plane, a yacht and Cancun homes for himself and family members.

i.      The ability to perform on the nine (9%) per annum represented was wholly dependent on the ability of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, CVP, PC, and/or M. Kelly to continue the fraudulent scheme, i.e., using funds obtained from subsequent purchasers to pay earlier purchasers. Wright, Corwin, Mike Jr., D. Kelly and others concealed information. Wright gave instructions as to the financial distributions to leaseholders of rental income and buyback provisions.

j.      Projected income from rental of a Universal Lease did not equal or exceed expense for operation of the unit.

k       M. Kelly controlled RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, CVP, and PC.

l.      No Universal Lease purchaser had obtained, or would obtain, any recorded or enforceable interest as to any parcel or real estate.

m.      Avalon and M. Kelly and other Defendants profited from the development, construction and sale of each Universal Lease unit.

n.      M. Kelly profited from the sale and resale of vacation units previously assigned to Plaintiff's to accommodate and recruit new buyers.  In the event of overbooking, M. Kelly would transfer the guests to alternative resorts where random cancellations would occur. This allowed M. Kelly to further his fraudulent scheme.

## CAUSES OF ACTION
### COUNT ONE
### Violation of RICO

104.  Plaintiffs reallege and restate the matters set forth in Paragraphs 1 through 103 and incorporate the same by reference as if set forth in full herein.

105.  M. Meyer, Greene, RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, PC, Camelot, M. Kelly, L. Leuth, L. Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, Escalante, and others, both known and unknown, associated themselves in fact, albeit not necessarily as part of a legal entity, and were an "enterprise," as that term is used in 18 U.S.C. §1961(4).

106.  The enterprise that included the above named individuals and entities and others, both known and unknown, engaged in a pattern of racketeering activity in a variety of ways,

including, but not limited to:

    a. engaging in "mail fraud" in violation of 18 U.S.C. §1341, inasmuch as the above named individuals and entities and others, both known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, and misrepresentations, placed and caused to be placed in a post office or other mail depository matters and things to be delivered by the Postal Service or by a private interstate carrier including, but not limited to, the following:

    i.    RHI, RHI-SA, YRI, YR-SA, M. Kelly, L. Kelly, Mike Jr., D. Kelly Wright, Corwin, and Campanale distributed, or caused to be distributed, YRI/RHI promotional materials to master brokers and sales agents using the mail.

    ii.    M. & E. Meyer distributed, or caused to be distributed, YRI/RHI promotional materials to sales agents and through the sales agents caused that promotional literature to be distributed to IPF Members and Ramey using the mail.

    iii.    RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, PC, Camelot, M. Kelly, L. Kelly, Mike Jr. D. Kelly Wright, Corwin, Campanale, Escalante, WPF, and Galaxy mailed, or caused to be mailed, "Dear Lease Holder" letters intended for Universal Lease purchasers, including IPF members and Ramey or their representatives.

    iv.    RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr., D. Kelly, Wright, Corwin, Campanale, and Escalante mailed, or caused to be mailed, copies of executed Universal Leases to purchasers, including IPF members and Ramey or their representatives.

    v.    RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, and Escalante mailed, or caused to be mailed, copies of the "Galaxy Residence Club Membership Rental Management Agreement," with respect to executed Universal Leases to be mailed to purchasers, including IPF members and Ramey or their representatives.

    vi    RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, and Escalante mailed, or caused to be mailed, monthly, quarterly or annual "rental compensation" checks to IPF members and Ramey or their representatives.

    vii.    RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, and Escalante mailed, or caused to be mailed, annual Statement of Account to IPF members and Ramey or their representatives.

    viii.    RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Wright, Corwin, Campanale, M. Kelly, Escalante, WPF, and Galaxy mailed, or caused to be mailed, a January 2003 "Dear Majesty Client" letter to IPF members and Ramey or their representatives.

ix.     Avalon mailed a Summer 2003 "Avalon Life" magazine to IPF members and Ramey.

x.      Avalon mailed a Summer/Fall 2003 "Avalon Vacation" ownership magazine to IPF members and Ramey.

xi.     RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Wright, Corwin, Campanale, M. Kelly, Escalante, WPF, Galaxy, and M. & E. Meyer mailed, or caused to be mailed, a June 8, 2004 "Dear Universal Leaseholder" letter to IPF members and Ramey or their representatives.

xii.    In January 2005, RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr.. D. Kelly, M. & E. Meyer, Wright, Corwin, Campanale, and Escalante mailed, or caused to be mailed, correspondence explaining the reduced payments to be attributable to hurricane damage, negative publicity, a saturated market in Cancun causing large discounts and a renovation of the properties.

   b.   engaging in "wire fraud" in violation of 18 U.S.C § 1343, and money laundering in violation of 18 U.S.C. § 1956 & 1957 inasmuch as the above named individuals and entities and others, both known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce writings, signals and sound for the purpose of executing such scheme or artifice, such parties filtered their ill-gotten gains through a series of transactions, so that the funds were sterilized to look like proceeds from legal activities, while concealing the true source, ownership, or use of funds the parties' actions included, but were not limited to, the following:

i.      Purchasers' funds were deposited to YRI's and/or Avalon's Indiana, Florida, and/or Ohio bank accounts from which the funds were wired to off-shore accounts for undisclosed purposes.  Lease Holders' monies were deposited into RHI, RHI-SA, YRI, YR-SA, and YIC accounts and, within the same accounts, M. Kelly, L. Kelly, Mike Jr.. D. Kelly, Beem, Leonard Kelly, Wright, Corwin, Campanale, and/or Escalante transmitted, or caused to be transmitted, rental payments to Leaseholders.  Later a new bank account was opened under the name of "World Phantasy Tours" and funds from RHI, RHI-SA,YRI, YR-SA, and YIC accounts were transferred to this new account, and then M. Kelly, L. Kelly, Mike Jr.. D. Kelly, Beem, L. Kelly, Wright, Corwin, Campanale, and/or Escalante transmitted, or caused to be transmitted, "rental" payments to Leaseholders.  The sole source of income for the World Phantasy Tours bank accounts was from RHI, RHI-SA, YRI, YR-SA, and YIC accounts in which the source of income for those accounts was from Leaseholder purchases, no rental income was generated. The monies collected from Leases Purchased were wire transferred to appear to be monies collected by WPT.  No monies were generated by WPT, Galaxy, or any other third-party leasing company.   A list of accounts used in this manner were:

        Resort Holdings International, National City Bank, Account Number 689467152.
        Resort Holdings International, Hemisphere National Bank, Account Number

9014265910.
Resort Holdings International, S.A., Dresdner Bank of New York.
Yucatan Resorts, National City Bank, Account Number 584928187.
World Phantasy Tours, Inc., The First Bank of Miami, Account Number
330023322

ii.      RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly,
L.Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, Escalante, and WPF
transmitted, or caused to be transmitted, by facsimile a "Dear Lease Holder"
communication intended for Universal Lease purchasers, including IPF members,
Ramey, or their representatives.

iii.      RHI, RHI-SA,YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L.
Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, Escalante, WPF, and M. & E.
Meyer transmitted, or caused to be transmitted by facsimile, a June 8, 2004 "Dear
Universal Leaseholder" letter to IPF members and Ramey.

iv.      RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy,  Camelot, M. Kelly, L.
Kelly, Mike Jr.. D. Kelly, M. & E. Meyer, Wright, Corwin, Campanale, and Escalante
transmitted, or caused to be transmitted by facsimile, "Client's Lease Update Pages" to
IPF members and Ramey or their representatives.

v.      Trust Company of America knew, or should have known, that RHI, RHI-SA,
YRI, YR-SA, Avalon, YIC, WPT, Galaxy,  Camelot, M. Kelly, L. Kelly, Mike Jr.. D.
Kelly, M. & E. Meyer, Wright, Corwin, Campanale, and Escalante were using the mails
to further the fraudulent enterprise in violation of 18 U.S.C. 1341.  Trust Company of
America knew Defendants used mails and wires to obtain financing, to send contracts and
checks, and to distribute proceeds of schemes to defraud Leaseholders.  Trust Company
of America engaged in financial transactions knowing the use of the proceeds were for
illegal activities and with the intent to promote the carrying on of unlawful acts
constituting money laundering under 18 U.S.C. § 1956(a)(1)(A)(i).  Trust Company of
America aided and abetted in furthering the M. Kelly et al Defendants' fraudulent
enterprise by associating themselves with the Universal Lease Program.  Trust Company
of America attempted to gloss over the failure of Defendants to pay-out the rental income
as represented, despite the numerous other red flags that Trust Company of America
knew existed, this demonstrates Trust Company of America's complicity and scienter.
They knew not only of the problems, but also had their own experts' evaluations, they
had received indications that there was a potentially serious problem and an extreme risk
of fraud. Accuracy and full disclosure to the purchasers was not Trust Company of
America's priority; closing the deal and collecting their fees was their main objective.
Trust Company of America desired the Universal Lease Program be accomplished and
succeed through the efforts of Trust Company of America in transferring Leaseholders'
funds to the Defendants' banking institutions. Finally, with public pressures mounting, an
inability to dismiss the obvious problems, and uncertainties rising, potentially
jeopardizing further transactions, Trust Company of America acquiesced to internal
pressures and relinquished its position as custodian.  Trust Company of America, in

violation of 18 U.S.C. § 2 in connection with offense under 18 U.S.C. § 1341, § 1343, and §1344, turned over Leaseholder funds to the Defendants with knowledge of the Defendants' fraudulent intent.

vi.    In late 2004, M. Kelly and Greene, among others, created Trust Company of the Pacific to allow M. Kelly to further his fraudulent enterprise by facilitating the transfer of IRA accounts, avoiding deregistration, and account holder penalties. Without a trust company to manipulate the financial aspects the fraudulent enterprise would have been exposed when the Leaseholders would have received notices from the IRS demanding tax payment for distributions of their IRA accounts that they used to purchase Universal Leases. M. Kelly's and Greene's acts resulted in mail, wire, and financial institution fraud under 18 U.S.C. § 1341, § 1343, and §1344. Trust Company of the Pacific knew Defendants used mails and wires to obtain financing, to send contracts and checks, and to distribute proceeds. Trust Company of the Pacific engaged in financial transactions with the knowledge that the funds ultimately would be used in illegal activities and with the intent to promote the carrying on of unlawful acts constituting money laundering under 18 U.S.C. § 1956(a)(1)(A)(i).

vii.    On or about December 1, 2004, RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr. D. Kelly, M. & E. Meyers, Wright, Corwin, Campanale, and Escalante transmitted, or caused to be transmitted by facsimile, a "November 2004" letter to IPF members and Ramey or their representatives.

viii.    In January 2005, RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Kelly, Mike Jr.. D. Kelly, M. & E. Meyer, Wright, Corwin, Campanale, and Escalante transmitted, or caused to be transmitted by facsimile, a letter explaining the reduced payments to be attributable to hurricane damage, negative publicity, a saturated market in Cancun causing large discounts and a renovation of the properties.

ix.    Beginning in March 2005, M. & E. Meyer contacted lease holders by telephone including IPF members and represented that the leases would have to be modified due to hurricane damage. This representation also was designed to conceal the diversion of funds and the fraudulent enterprise.

x.    M. Kelly, as President and CEO of PC and Panorama, with the assistance of other named and unknown defendants and without the Universal Leaseholders knowledge, used funds from his fraudulent enterprises to fund Puerto Cancun, the largest residential development in the Mexican Caribbean. Puerto Cancun is a five-year project, with investment totals exceeding $1 billion dollars, including over 2,100 luxury condominiums and apartments, a Tom Weiskopf Championship Resort Golf Course, a full service mega yacht marina, over 435 gated single family residential lots, five resorts, a business park, and a shopping center.

107.    The activities of the enterprise that included the above named individuals and entities and others, both known and unknown, affected interstate and foreign commerce.

108.  The above named individuals and entities and others, both known and unknown, directly and/or indirectly, conducted and/or participated in a pattern of racketeering activity.

109.  The activities of the above named individuals and entities and others, both known and unknown, violated RICO, 18 U.S.C. § 1962.

110.  Plaintiffs have been injured in their business or property by reason of the above named individuals and entities and others, both known and unknown, violations of RICO, 18 U.S.C. § 1962.

111.  Because of the above named individuals and M. Kelly entities and others, both known and unknown, violations of RICO, 18 U.S.C. § 1962, Plaintiffs are entitled to recover threefold their damages sustained and the cost of suit, including all reasonable attorney's fees.

## COUNT TWO
## Common Law Fraud

112.  The Plaintiffs reallege and restate the matters set forth in Paragraphs 1 through 111and incorporate the same by reference as if set forth in full herein.

113.  RHI, RHI-SA,YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Leuth, L. Kelly, Mike Jr.. D. Kelly, M. & E. Meyer, Greene, Wright, Corwin, Campanale, Escalante and others, both known and unknown, made the following oral and/or written representations to IPF members and Ramey or their representatives:

a.  There was to be a guaranteed eleven (11%) or nine (9%) percent per annum rental income on a Universal Lease purchase.

b.  The eleven (11%) or nine (9%) percent per annum rental income was guaranteed for twenty-five (25) years and could be extended for an additional twenty (20) years.

c.  At any time within thirty-six months after purchasing a Universal Lease, IPF members and Ramey could cancel their Universal Leases and receive an immediate return of all monies invested, together with returns accrued, less a ten (10%) redemption fee.

d.  The Universal Leases were supported by "debt-free" resort properties.

e.   The Universal Leases were fully safe and secure.

f.   WPT/YRI/RHI would be able to purchase all Universal Leases at full value thirty-six (36) months after the date of the purchase.

g.   The properties were insured by internationally known, highly rated insurance companies against property, casualty loss, and damages including hurricanes.  Defendants represented the insurance would cover rental income loss in the event of a Hurricane.

h.   Monthly payments and/or statements of leaseholders' accounts constituted the payment or accrual of annual income generated by the rental of the leaseholders' units.

i.   The reduced payments or lack of accrued income from Galaxy was due to hurricane damage, negative publicity, a saturated market in Cancun, and renovation costs.

j.   In 2005, the leases would have to be modified due to hurricane damage.

114.   Those representations were material to IPF members and Ramey's decisions to purchase Universal Leases and to continue to hold the Universal Leases.

115.   Those representations were false.

116.   Those representation were made either with knowledge of their falsity or without knowledge of their truth or falsity and with the intent that IPF members and Ramey rely upon them.

117.   IPF members and Ramey relied and acted upon those representations.

118.   As a result of their reliance, IPF members and Ramey purchased no less than $50,000,000 in Universal Leases.

119.   Because IPF members and Ramey's Universal Leases are now valueless, they have been damaged in an amount no less than $95,000,000.

120.   M. Meyer, Greene, RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, M. Kelly, L. Leuth, L. Kelly, Mike Jr.. D. Kelly, Wright, Corwin, Campanale, Escalante, and others, both known and unknown, are jointly and severally liable to IPF members and Ramey for their damages of $95,000,000.

## COUNT THREE
### Rescission of Universal Leases

121.   Plaintiffs reallege and restate the matters set forth in Paragraphs 1 through 120 and incorporate the same by reference as if set forth in full herein.

122.   Plaintiffs have completely performed the agreement between the parties. The falsity of the Defendants' representations as set forth above did not become known until Defendants discontinued making payments as set forth above.  Since then it has become apparent that the Defendants' representations were false.

123.   Plaintiffs have sustained damages through the loss of revenue from the Universal Leases and defendants' failure to perform as agreed.  Plaintiffs are willing to, and hereby do, offer to restore to Defendants, so far as Plaintiffs can, Plaintiffs' interest in the Universal Leases purchased; in exchange Plaintiffs seek to recover the purchase price, loss of represented rental income, and any derivative losses that Plaintiffs incurred based upon the Defendants' acts of deceit and fraud which, under the circumstances, caused the Universal Leases to become useless and of no value to the purchaser.  Additionally, Plaintiffs seek the equitable relief of rescission of the contracts and restoration of the parties to their status prior to the execution of the universal lease purchase contracts at issue in this action.

## COUNT FOUR
### Breach of Contract

124.   Plaintiffs reallege and restate the matters set forth in Paragraphs 1 through 123 and incorporate the same by reference as if set forth in full herein.

125.   As a result of Defendants' failure to perform as agreed pursuant to the undertakings in the universal leases and related documents, Defendants have breached those agreements.

126.    As a result of these breaches, Plaintiffs have sustained damages, including the loss of revenue from the universal leases, for which the Defendants are liable to the Plaintiffs.

## REQUEST FOR APPOINTMENT OF RECEIVER

127.    The Plaintiffs reallege and restate the matters set forth in Paragraphs 1 through 126 and incorporate the same by reference as if set forth in full herein.

128.    Based upon the acts/or omissions of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, CVP, PC, Panorama, Trust Company of the Pacific, M. Kelly, L. Leuth, L. Kelly, Mike Jr.. D. Kelly, M. & E. Meyer, Greene, Wright, Corwin, Campanale, and Escalante described herein, Plaintiffs request that a Receiver be appointed to take control and administer the assets of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, CVP, PC, Panorama, Trust Company of the Pacific, M. Kelly, L. Leuth, L. Kelly, Mike Jr.. D. Kelly, M. & E. Meyer, Greene, Wright, Corwin, Campanale, and Escalante for the benefit of the Plaintiffs and others similarly situated.

129.    The allegations contained herein clearly establish that the Plaintiffs and others have beneficial interests in RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, Camelot, CVP, PC, Panorama, and Trust Company of the Pacific, which need to be conserved by an officer of the Court.  The need for a Receiver is immediate; Plaintiffs are seeking inter alia equitable relief, which depends on the preservation of the assets of the listed entities currently in their possession and control and the assets of other entities subject to the control of the named individual Defendants.  M. Kelly, L. Leuth, L.  Kelly, Mike Jr.. D. Kelly, Beem, Leonard Kelly, M. & E. Meyer, Greene, Corwin, Campanale, and Escalante are believed to have committed instances of financial wrongdoing involving the funds used to purchase the Universal Leases, including money laundering, and transferring, or dissolving assets in order to elude authorities.

For example, their interests and the interests of RHI and Avalon now extend to the following properties:

- Avalon Panama

- Avalon Excalibur Acapulco

- Avalon Grand Hotel

- Avalon Baccara Hotel

- Avalon Reef Isla Mujeres

- Zipp Rent a car

- Bluewater Marina and Bluewaters Adventures

- Pok-Ta -Pok Golf Club

- The City Disco

- Porter House Restaurant

- Odyssey Beach Club

- Isla Mujeres project

- Puerto Cancún

- Avanti Motors

- DMK Properties LLC

Funds from the sale of the Universal Leases are believed to be held by any or all of these organizations.

130.  In addition, M. Kelly, L. Leuth, L. Kelly, Mike Jr., D. Kelly, Beem, Leonard Kelly, M. & E. Meyer, Greene, Corwin, Campanale, and Escalante are believed to have established at least the following entities subject to their direct or indirect control for the purposes of secreting assets or placing those assets beyond the reach of leaseholders:

- Corporativo Nola.S.A. de C.V.

- E.I.K. S.A. de C.V.

- Vestco.S.A. de C.V.

- First Sabre S.A. de C.V.

- Azzurriccio. S.A. de C.V.

- In Riva Mare. S.A. de C.V.

- Buona Stanza. S.A. de C.V.

- Paraiso del Pacifico S.A.de C.V.

- Naviera Mipis. S.A. de C.V.

- Aqua Tours. S.A. de C.V.

- Corporativo Roble S.A. de C.V.

- Senza Ubio Bella. S.A. de C.V.

- Servicios Profesionales Keara. S.A. de C.V.

- Mattinata. S.A. de C.V.

- Operadora de Hoteles Grand.S.A. de C.V.

- Panorama Communities, S.A. de C.V.

- Comercializadora Vacational Panama, S.A. de C. V.

- Puerto Cancún, S. A. de C.V.

131.  M. Kelly has recently been arrested by FBI agents on charges he ran a $400 million pyramid scheme through the sale of time-share leases in Mexico. M. Kelly is currently in U.S. custody in Chicago, Illinois.

132.  While M. Kelly may not be able to act directly to further waste or transfer the assets of the above entities, others who participated in M. Kelly's fraudulent enterprise remain at large

and are capable of wasting or transferring the assets of the above entities at the direction of M. Kelly or others. In addition, the assets of the above entities are in danger of being dissipated through the lack of effective control and management of their operations in M. Kelly's absence.

133. Further, the misconduct of M. Kelly, L. Kelly, M. & E. Meyer, Greene, Corwin, Campanale, and the misconduct of others participating in the fraudulent enterprise already has placed Plaintiffs' interests in jeopardy. Plaintiffs have received notice that if their maintenance fees and rents are not paid their leases will be foreclosed, causing their interests to be lost. Currently, Plaintiffs cannot contact M. Kelly, L. Lueth, L. Kelly, Mike Jr., D. Kelly, Beem, Leonard Kelly, M. & E. Meyer, Greene, Corwin, Campanale, and Escalante. Other participants in the enterprise involved in the management of the above entities have stopped responding to inquiries about the status of the leases, requests to resell leases or to provide an accounting as to the value of their interests.

134. If the receiver is not appointed there is a high probability that the beneficial interest of the Plaintiffs will be irreparably harmed. Governmental agencies, creditors, or through the misdirection of M. Kelly, L. Lueth, L. Kelly, Mike Jr., D. Kelly, Beem, Leonard Kelly, M. & E. Meyer, Greene, Corwin, Campanale, Escalante, and others participating in his enterprise, the Plaintiffs' interests likely will be cancelled or superseded, and any value thereof lost forever. Further, Plaintiffs submit there is no other realistic alternative to the appointment of a Receiver, and the appointment of a qualified Receiver will serve to benefit not only these Plaintiffs but all Universal Lease purchasers. A Receiver will be able to investigate the wrongdoings of the enterprise and work with the appropriate authorities to locate and recover assets that may have been transferred to other entities and locations. The Receiver will preserve the assets and effectuate or reform the beneficiaries' purchase contracts.

135. The Plaintiffs request that the court approve a Receiver made up of Leaseholders to protect them from the furtherance of fraud. Resort Management Group LLC ("the Company") was formed by a group of Universal Leaseholders. Officers and a Board of **Managers** have been elected and they have the knowledge and experience in management, administration, financing, and disposition of timeshares interests.

The Company's sole purpose is to recover and distribute assets to Universal Lease purchasers. A part of this purpose will be to investigate the wrongdoings and criminal activities that caused great financial harm to the Universal Leaseholders. Legal actions and restitution will become an ancillary part of their mission to recoup and distribute assets to the members. Upon completion of these tasks, the new company will cease to exist as a business entity.

136. The Resort Management Group, LLC's Board of Managers will have the same powers as a Receiver. Resort Management Group, LLC's Managers will file complaints on wrongdoers allowing the proper government agencies to investigate. Resort Management Group, LLC's Managers will file civil lawsuits against the wrongdoers based on the prospects of recovery, contrary to a traditional Receiver who may pursue a civil lawsuit regardless of economic outcome garnering unearned receivership fees. Since a traditional Receiver does not have a personal interest in the funds, the traditional Receiver can discard the practical analysis of its actions. The traditional Receiver does not fret about the fact that the remaining assets of the company may be robbed by unsuccessful litigation attempts. However, a corporation run by interested parties has a personal stake, and its actions are governed by that interest.

137. Plaintiffs request that Resort Management Group, LLC, a Texas Limited Liability Company, be appointed as the Receiver for the assets of the above entities for the purpose of

conserving and administering those assets and managing the affairs of those entities, and to ensure that the beneficial interests of Plaintiffs and others are preserved and maintained.

138.    Plaintiffs request that Resort Management Group L.L.C., as the Receiver, shall oversee the management and disposition of the Receivership Defendants' assets for the benefit of the Universal Leaseholders and that any and all securities to be issued pursuant to the Receiver's plan to marshal, preserve, account for and liquidate the Receivership Defendants assets for the benefit of Universal Leaseholders will be exempt from Section 5 of Securities Act of 1933 (15 U.S.C. § 77e) and any state or local law requiring registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security provided in Section 1145 of the Bankruptcy Code, except with respect to the Receiver's employment of an entity that is an underwriter as defined in Section 1145(b) of the Bankruptcy Code.

## **ARGUMENTS AND AUTHORITIES**

139.    This cause is before the Court on Plaintiffs' request for appointment of an Equitable Receivership to collect rent payments and manage timeshare interests during the pendency of this action.

140.    When federal jurisdiction is premised upon RICO, the District Court looks to the law of the underlying forum. *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 318 (5th Cir. 1999) quoting *Erie v. Tompkins*, 304 U.S. 64 (1938).

141.    Pertinent Texas Statutes provide for the appointment of a receiver in certain statutorily enumerated circumstances.    The circumstances relevant to the request for the appointment of a Receiver in this action include (i) an action between partners or others jointly owning or interested in any property or fund; or (ii) for a corporation that is insolvent, is in imminent danger of insolvency, has been dissolved, or has forfeited its corporate rights; or (iii) in

any other case in which a receiver may be appointed under the rules of equity. The receiver may be appointed on the application of the plaintiff in the action or another party. The party must have a probable interest in or right to the property or fund, and the property or fund must be in danger of being lost, removed, or materially injured. Tex. Civ. Prac. & Rem. Code § 64.001.

142.    It is undisputed that a federal district court has the power to appoint a receiver to take possession of and to conserve assets. Although it is clear that a receivership is not an end in itself, there is no doubt that a court of equity has the power to appoint a receiver when the appointment is in connection with an action that "state[s] a cause [of action] for equitable relief." *Grupo Mexicano de Desarrolo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999; or "ancillary to some form of final relief which is appropriate for equity." *Gordon v. Washington*, 295 U.S. 30, 38 (1935); See also, *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 290, 61 S.Ct. 229, 85 L.Ed. 189 (1940) (upholding a preliminary injunction that prevented a party from transferring assets as "a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill" where the complaint stated claims for equitable relief (namely, rescission of contract and restitution)).

143.    Federal district courts are allowed to appoint a receiver after considering: the merits of the case, the appearance of fraudulent conduct, imminent danger to the collateral, and the balance of equities. A district court is not required to conduct a hearing on an appointment of receiver where the record discloses sufficient facts for the court to render a decision. *Bookout v. First Nat'l Mortg. & Discount Co.,* 514 F.2d 757, 758 (5th Cir. 1975).

144.    Once the decision to appoint a receiver is made, the court is vested with the discretionary authority to enter such orders as may be appropriate and necessary for the receiver to perform the duties and responsibilities to preserve and maintain the property and funds within

the receivership estate. The rules of equity govern all matters relating to the appointment, powers, duties, and liabilities of a receiver and to the powers of a court regarding a receiver. Tex. Civ. Prac. & Rem. Code § 64.004. See, *SEC v. Forex Asset Management, L.L.C.,* 242 F. 2d 325 (5th Cir. 2001). A federal district court exercises broad powers and wide discretion in crafting relief in an equitable receivership proceeding. *SEC v. Safety Finance Service, Inc.,* 674 F.2d 368, 373 (5th Cir. 1982).

145.    Section 5 of the Securities Act of 1933 prohibits the sale of unregistered securities. 15 U.S.C. § 77c (1988).   Section 12(1) gives investors a right of rescission for violations of section 5. 15 U.S.C. § 77l(1) (1988).   The Receiver prospectively requests the power to issue certificates of value to purchasers should that action be necessary to attain capitol to assist in the preservation, maintenance, or administration of the Receivership.   At that time the Receivership may be questioned as to whether those certificates of value are unregistered securities, but section 5 is subject to a number of exceptions and limitations specifically set forth in the Securities Act of 1933.   15 U.S.C. §§ 77c & 77d (1988).   Specifically applicable by analogy is the provision in (a) (7) which exempts certificates issued by a receiver or by a trustee or debtor in possession in a case under Title 11 of the United States Code, from the securities regulations when such certificates are issued with the approval of the court.   15 U.S.C. § 77c (1988).   Here even though operating under an equitable receivership outside of Bankruptcy, all powers not specifically delegated by the Order Appointing the Receiver shall be approved by the Court. Prospectively the aggregate amounts of the certificates issued shall be minimal, far less than the $ 5,000,000 threshold by which no security may be exempted from the Securities Acts.   The issue of certificates by the Receiver will not undermine the enforcement of the Securities Acts of 1933 or 1934.   The requirement that the certificates issued by the Receiver conform to the

specifics of these Acts is not necessary to the public interest, nor for the protection of investors, and by reason of their limited character of their public offering and that such actions are subject to this Court's approval, the Receiver requests an exemption from the Securities Acts of 1933 and 1934.  15 U.S.C. § 77c.

146.    The Court should appoint a Receiver and vest the Receiver with such powers as may be necessary to preserve, maintain, and administer the Receivership Assets which are of a unique character.  Such relief includes, without limitation, the unfettered ability of the Receiver to have authority over the Universal Leases, stays and restraining order(s) prohibiting fragmented litigation related to the Universal Leases from occurring in courts other than this Court, approval of financing arrangements to ensure continued payment of rents and for operating and administrative expenses, and such other and further relief as the Court and/or the Receiver, subject to Court approval, deem appropriate or necessary for the preservation and protection of M. Kelly's and other Defendants' assets to garner a just result for the approximately 9,000  Universal Lease owners.

WHEREFORE, premises considered, Plaintiffs, **I P FUND 1, INC.**, and its Members, and **THOMAS B. RAMEY, JR.**, pray that the Court appoint a Receiver for the assets of **MICHAEL E. KELLY, LORI LEUTH  KELLY, LORI KELLY LEVY, MICHAEL P. KELLY JR., DONALD KELLY, GWEN BEEM,  LEONARD KELLY, MARK G. MEYER, BRANTLEY H. WRIGHT, JOHN CORWIN, RICK GREENE, ANTHONY J. CAMPANALE, GABRIEL ESCALANTE TORRES, ERIN MEYER, RESORT HOLDINGS INTERNATIONAL, INC., RESORT HOLDINGS INTERNATIONAL, S.A., YUCATAN RESORTS, INC., d/b/a YUCATAN RESORTS, S.A., YUCATAN RESORTS, S.A. DE C.V., YUCATAN INVESTMENT CORP., AVALON RESORTS, S.A., WORLD PHANTASY TOURS, INC., d/b/a MAJESTY TRAVEL d/b/a VIAJES MAJESTY, GALAXY PROPERTIES  MANAGEMENT, S.A., THE CAMELOT GROUP, INC. S.A. COMERCIALIZADORA VACACIONAL PANANMA, S.A. PUERTO CANCUN, S.A. PANORAMA COMMUNITIES, S.A** TRUST COMPANY OF AMERICA, and TRUST COMPANY OF THE PACIFIC and that Plaintiffs recover attorney fees, expenses and costs. Plaintiffs further pray for judgment against Defendants **MICHAEL E. KELLY, LORI LEUTH KELLY, LORI KELLY LEVY, MICHAEL E. KELLY JR., DONALD KELLY, GWEN BEEM,  LEONARD KELLY, MARK G. MEYER,   BRANTLEY H. WRIGHT, JOHN CORWIN, RICK GREENE, ANTHONY J. CAMPANALE, GABRIEL ESCALANTE**

TORRES, ERIN MEYER, RESORT HOLDINGS INTERNATIONAL, INC., RESORT HOLDINGS INTERNATIONAL, S.A., YUCATAN RESORTS, INC., d/b/a YUCATAN RESORTS, S.A., YUCATAN RESORTS, S.A. DE C.V., YUCATAN INVESTMENT CORP., AVALON RESORTS, S.A., WORLD PHANTASY TOURS, INC., d/b/a MAJESTY TRAVEL d/b/a VIAJES MAJESTY, GALAXY PROPERTIES MANAGEMENT, S.A., THE CAMELOT GROUP, INC., COMERCIALIZADORA VACACIONAL PANANMA, S.A., PUERTO CANCUN, S.A. PANORAMA COMMUNITIES, S.A., TRUST COMPANY OF AMERICA, and TRUST COMPANY OF THE PACIFIC consistent with the allegations set forth herein, and such other and further relief, general or special, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,
**I P FUND 1, INC.,**
**THOMAS B. RAMEY, JR.,**

By Counsel

Stephen J. Johnson
State Bar No 00790192
13750 San Pedro, Suite 600
San Antonio, Texas 78232
(210) 546-2184 Voice
(210) 546-2185- Facsimile

JS 44 (Rev. 10/06)

# CIVIL COVER SHEET
3 07 CV 1556 - P

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
IP Fund 1, Inc.
Thomas B. Ramey, Jr.

## DEFENDANTS
Michael E. Kelly, See Attachment to Civil Cover Sheet for complete listing of Defendants

**(b)** County of Residence of First Listed Plaintiff ___Bexar___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___Cancun, Mexico___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**RECEIVED**
**SEP 1 2 2007**
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Stephen J. Johnson, 13750 San Pedro, Suite 600, San Antonio, Texas 78232. Telephone: (210) 546-2184

Attorneys (If Known)
Unknown

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL PROPERTY** / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | | | |
| | ☐ 440 Other Civil Rights / ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause: See Attachment to Civil Cover Sheet

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Receivership

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE _9/04/07_

SIGNATURE OF ATTORNEY OF RECORD
_Stephen J Johnson_

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44a Reverse (Rev. 10/06)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.   (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.   Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.   Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:   U.S. Civil Statute: 47 USC 553
                                                           Brief Description: Unauthorized reception of cable service

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.** This section of the JS 44 is used to reference cases that are related to this filing, if any. **If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases.** A case is "related" to this filing if the case: (1) involves some or all of the same parties and is based on the same or similar claim; (2) involves the same property, transaction, or event; (3) involves substantially similar issues of law and fact; and/or (4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Civil Cover Sheet Attachment

*IP FUND 1, INC. and THOMAS B. RAMEY, JR. v. MICHAEL E. KELLY et al.*

## I (c) Attorneys:

The Law Office of Stephen J. Johnson
Stephen J. Johnson
State Bar No. 00790192
13750 San Pedro, Suite 600
San Antonio, Texas 78232
(210) 546-2184 - Voice
(210) 546-2185- Facsimile

## VI Cause of Action

U.S. Civil Statutes:
18 U.S.C. § 2
18 U.S.C. § 1337 (a), 1341, 1343, 1344, 1367(a), and 1391(b).
18 U.S.C. § 1956 & 1957
18 U.S.C. § 1961, 1962, 1964, & 1965

Brief Description of Cause:

Beginning in or about 1998, Defendants began incorporating or otherwise organizing or establishing various entities, to sell nine-month promissory notes on timeshare properties located in Cancun, Mexico, and other Central American locales. In July 1999, the New Mexico and South Carolina State Security Boards held administrative hearings claiming the nine-month promissory notes were unregistered securities and demanded the Defendants stop selling the notes and refund the monies to purchasers. The Universal Lease program was initiated as a continuation of the fraudulent nine-month enterprise. Defendants conspired to sell Universal Leases to conceal the fraud begun with the nine-month notes. Defendants reimbursed nine-month note holders by using proceeds from the sale of universal leases and, in some instances, substituting the nine-month notes with Universal Leases. This satisfied various state regulatory

proceedings.  Defendants developed a marketing program for the Universal Leases and recruited and coordinated sales agents to market and sell the Universal Leases.  Under the Universal Lease Program a purchaser paid $5,000 for the use of one RHI assigned vacation unit for a designated week biannually.  The purchaser was required to pay annual maintenance fees.  Purchasers retained the option to personally use the vacation unit or rent the unit to produce passive income.  Defendants promoted an "independent third-party" management company to lease the vacation unit promising a return of rental income of eleven (11%) or nine (9%) percent per annum for a period of 25 years, after which time the lease would be renewable for another 20 years.   Defendants represented that if the leaseholder allowed the rental income to accumulate in an account held by one of the Defendants' entities, the account would incur no taxable earnings.  Through a series of misrepresentations, designed to conceal the diversion of leaseholders' funds, Defendants created a fraudulent enterprise that included using monies generated by the sale of Universal Leases to be paid to other leaseholders as "rental income", and redirecting funds to other ventures.  Eventually, Defendants were unable to continue to pay the leaseholders as previously represented.  The activities of the named Defendants and others, both known and unknown, violated RICO, 18 U.S.C. § 1962 and other U.S. Civil Statutes.

**VII Requested in Complaint**
**Demand:**

IPF members and Ramey purchased a minimum of $50,000,000 in Universal Leases. They have not received the represented rental returns. Through the Defendants' mismanagement, the leases are currently valueless and the estimated amount of damages

should be tripled if the Defendants are found in violation of RICO, 18 U.S.C. § 1962. Defendants also seek to recover the cost of suit, expenses and all reasonable attorneys' fees.

Plaintiffs request that an Equitable Receivership be appointed to take control and administer the assets of RHI, RHI-SA, YRI, YR-SA, Avalon, YIC, WPT, Galaxy, PC, Camelot, CVP, M. Kelly, L. Leuth, L. Kelly, Mike Jr., D. Kelly, M. & E. Meyer, Greene, Wright, Corwin, Campanale, and Escalante [complete ?] for the benefit of the Plaintiffs and others similarly situated.


## VIII Related Case(s) pending or closed

The central Defendant, Michael E. Kelly, is currently awaiting a criminal indictment in cause entitled, *United States of America v. Michael E. Kelly*, United States District Court in the Northern District of Illinois, Eastern Division, Cause No. 06 CR 964. Numerous regulatory proceedings by state securities boards have been brought against the defendants. Numerous state civil suits have been filed naming Michael E. Kelly and the agents who sold the Universal Leases as defendants.